# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
July 19, 2011 Session

## STATE OF TENNESSEE v. MICHAEL ANTHONY SAUNDERS

**Appeal from the Circuit Court for Dickson County**
**No. 22CC-2008-CR-522     Robert E. Burch, Judge**

**No. M2009-02462-CCA-R3-CD - Filed September 13, 2011**

A Dickson County Circuit Court jury convicted the defendant, Michael Anthony Saunders, of one count of aggravated assault, *see* T.C.A. § 39-13-104(a)(1)(B) (2006), and one count of vandalism of property valued at $1,000 or more but less than $10,000, *see id.* § 39-14-408. The trial court imposed concurrent sentences of three years and two years, suspended to probation following the service of six months' incarceration in the county jail. In addition to contesting the sufficiency of the evidence to support his convictions, the defendant contends on appeal that the trial court erred by (1) denying his motion for a mistrial based upon inflammatory statements made by the victim, (2) denying his request for judicial diversion, and (3) denying him full probation. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

B. Kyle Sanders, Dickson, Tennessee, for the appellant, Michael Anthony Saunders.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Billy Henry Miller, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On March 17, 2008, Dickson County Highway Department employee Jasper Odell McEwin met the defendant, Michael Anthony Saunders, at the defendant's home to discuss the defendant's report of a water drainage problem on his property. Another highway department employee, Terry Weaver, accompanied Mr. McEwin to the defendant's

residence. After the three men talked in the defendant's yard for approximately 15 to 20 minutes, the defendant's neighbor and victim, Shirley Jean Davis, arrived to discuss with the defendant a property line dispute. Mr. McEwin testified at trial that the defendant became "more angry" as he talked to the victim and that "[t]he hotter the argument got . . . [the defendant] got to cussing" the victim. Mr. McEwin unsuccessfully tried to quiet the defendant. He did not hear the victim "cuss" the defendant at any time during the argument, but he did recall that both the victim and the defendant became "more agitated" as the argument progressed.

At one point during the argument, the victim showed the defendant a survey "plat" indicating the location of their property lines. The defendant "got the paper, wadded it up, pulled down his britches, wiped his behind, [and] throwed [sic] it down." Then Mr. McEwin and Mr. Weaver decided to leave. They drove "not hardly 100 yards" away when they stopped because they "heard a racket." Mr. McEwin saw the victim trying to turn her car around while the defendant was "slinging something at her" that looked like a chopping axe. The victim eventually drove to where Mr. McEwin's truck had stopped and asked him to call the police. He observed damage to the victim's car caused by the axe.

Mr. McEwin testified that he did see the defendant make a telephone call as the victim approached his home, but he did not know whether the defendant telephoned 9-1-1. He also maintained that he never saw the victim pull into the defendant's driveway and that the victim turned her car around in the street. At the conclusion of his testimony and after being excused from the witness stand, Mr. McEwin unsolicitedly – and without objection by either party – remarked, "I hope I don't see this no more. Nobody acting like these people act."

Terry Phillip Weaver testified that the defendant had "come to the [highway department] shop raising a racket with . . . one of the secretaries up there about water getting under his house." He recalled that the defendant was "getting a little ill" with the secretary and threatening to sue the county, so Mr. Weaver and Mr. McEwin drove to the defendant's home to discuss the reported drainage problem. While they were discussing the drainage issue, Ms. Davis arrived, and she and the defendant "got to arguing."

Mr. Weaver recalled that the defendant was "getting a little more irritated [with the victim] all the time" and was using some "pretty rough" language when speaking to her. When the defendant stuck the survey down his pants and threw it on the ground, Mr. Weaver decided that the argument had "done got out of hand," so he told Mr. McEwin that they needed to leave. As Mr. Weaver drove a short distance away, he heard the victim's "blowing the horn and hollering." When the victim drove to where they had stopped, the two men "called the law over there." Mr. Weaver said that the police arrived quickly and that the

defendant was still "hollering" at the victim from a distance. Because Mr. Weaver was driving, he did not see the defendant swing anything at the victim's vehicle, but he did see the damage to the vehicle.

The 67-year-old victim, Shirley Jean Davis, testified that she was "very much afraid to go down [to the defendant's home by herself] . . . because he ha[d] a violent nature." She decided to discuss the property line issue when she saw Mr. McEwin there because she "felt like [she] would be safe." Before she got out of her car, the defendant was already "cussing" her. She recalled that the defendant called her "a 'G' 'D' trouble making 'B'" and that he "went nuts . . . started cussing [her]." The victim showed the defendant the survey. He looked at the paper "for a pretty good while" then "bent over like that and wiped his behind with the piece of paper" while uttering a stream of profanity at the victim. When the victim did not react to his antics, the defendant "pulled his pants down, ex[pos]ed his butt[, t]ook the paper again, and wiped his butt with the paper."

The victim then decided it was time to go home. As she walked to her car, the defendant said, "'I sure hope you're a light sleeper. There's a whole lot goes on around here at night.'" The victim got in her vehicle, and, as she began to turn it around, the defendant approached her car with what "looked like a 50 pound splitting maul." He began striking her car, hitting it seven or eight times. The front end of her car sustained the most damage, and the attack perforated the sheet metal in several areas. The victim did not initially move because she was afraid the defendant would accuse her of assaulting him with her car. In an effort to escape the defendant, the victim hit a water hydrant at least twice. The victim testified that she "was really scared for [her] life."

On cross-examination, the victim maintained that she did not enter the defendant's driveway in an effort to turn her car around. She said that the defendant first struck her car while she was still in park. The victim recalled that she tried to avoid the defendant throughout the attack. She also stated that had she wanted to run over the defendant, she could have, but she maintained that she was only trying to avoid the defendant throughout the altercation.

Fred Miller, general manager of Gene's Body Shop, repaired the victim's 2000 Chrysler 300M at the cost of $5,427.41, within $100 of totaling the vehicle. The car sustained damage to the front bumper, headlights, hood, front fender, air conditioner condenser, and radiator. The damage appeared to have been inflicted by a "sharp, heavy object" like an axe or maul. The car also sustained damage to the rear end with red marks consistent with paint from a fire hydrant.

The defendant presented the testimony of Dickson County Sheriff's Office

Detective Chris Lewis. As a patrol deputy at the time, Detective Lewis responded to a "civil standby" call made by the defendant because there had been "previous property disputes" between the defendant and the victim. On his way to the scene, Detective Lewis received a second call indicating that the defendant reported the victim tried to hit him with her car. Detective Lewis arrived and spoke to the victim who told him that the defendant "started hitting her car" when she tried to leave. The victim indicated a desire to press charges against the defendant.

Detective Lewis next spoke to the defendant, who was still standing in his yard "agitated and cursing" so much that Detective Lewis "had to tell him numerous times to lower his voice and stop cursing." The defendant told Detective Lewis that the victim drove toward him as he walked away from the argument, so he grabbed his axe and hit her car. The defendant also indicated a desire to press charges against the victim. Detective Lewis explained that he did not make any arrests at the scene because he "was unable to determine the primary aggressor . . . due to the conflict in stories and statements."

Detective Lewis saw tire tracks that "went partially into the [defendant's] driveway," but he could not determine when or by whom the tracks were made. He stated that the victim testified consistently with her statement at the scene. He acknowledged that the defendant admitted hitting the car with the axe but that the defendant claimed self-defense.

Based upon this evidence, the jury convicted the defendant of aggravated assault with a deadly weapon and vandalism of property valued over $1,000 but less than $10,000. At sentencing, the trial court denied the defendant's request for judicial diversion. The trial court imposed concurrent minimum sentences of three years for the aggravated assault conviction and two years for the vandalism conviction and suspended the sentence to probation following the service of six months' incarceration in the county jail. On appeal, the defendant contends that the evidence is insufficient to support his convictions, that the trial court erred by denying his motion for a mistrial, and that the trial court erred by denying his request for judicial diversion and, alternatively, by denying him full probation. We will address each allegation in turn.

*Sufficiency of the Evidence*

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard

-4-

applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

A conviction of aggravated assault, as relevant to this case, requires evidence that a defendant "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101(a)(1) and uses or displays a deadly weapon." T.C.A. § 39-13-102(a)(1)(B). Our Code defines assault, as relevant to this case, as "[i]ntentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury." *Id*. § 39-13-101(a)(2).

The Code further provides "[a]ny person who knowingly causes damage to or the destruction of any real or personal property of another . . . knowing that the person does not have the owner's effective consent is guilty of [vandalism]." *Id*. § 39-14-408(a).

The defendant contends that the evidence is insufficient to support his convictions arguing that "the weight of the evidence presented to the jury in this matter showed that [he] was acting in self-defense when he took the actions he did." We note that the defendant cited no authority in support of his argument of this issue. For this reason, we could deem the issue waived under this court's rules. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by the argument, citation to authorities, or appropriate references to the record will be treated as waived.").

Nevertheless, in the light most favorable to the State, the evidence in this case shows that the defendant engaged in a heated exchange with the victim immediately upon her arrival. The defendant cursed the victim and was extremely rude and provocative in dropping his pants and wiping the victim's survey on "his bare butt." When this behavior prompted the victim and the county highway employees to leave, the defendant attacked the victim's car with an object described as an axe or a heavy splitting maul, a deadly weapon. The victim testified that she did not drive toward the defendant and, in fact, tried to avoid

him because she feared for her life. The victim's car sustained substantial damage from the attack. The jury accredited the testimony of the victim and rejected the defendant's claim of self-defense, as was within their province. Accordingly, we conclude that the evidence is sufficient to support the defendant's convictions of aggravated assault and vandalism.

*Mistrial*

Next, the defendant argues that the trial court erred by denying his request for a mistrial after the victim made several inflammatory statements concerning the defendant's reputation for violence in the community and past violent encounters with the victim. The State argues that the trial court's denial of the defendant's request for a mistrial was appropriate because the trial court gave a thorough curative instruction concerning the statements and also polled the jury to determined that the extraneous comments would not affect their verdict.

Whether to grant a mistrial is an issue entrusted to the sound discretion of the trial court. *See State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). The burden of establishing the necessity for mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Although Tennessee courts do not apply any exacting standard for determining when a mistrial is necessary after a witness has injected improper testimony, we have often considered (1) whether the improper testimony resulted from questioning by the State, rather than having been a gratuitous declaration, (2) the relative strength or weakness of the State's proof, and (3) whether the trial court promptly gave a curative instruction. *See State v. William Dotson*, No. 03C01-9803-CC-00105, slip op. at 9 (Tenn. Crim. App., Knoxville, June 4, 1999).

During the State's direct examination of the victim, the victim made numerous unsolicited comments. When explaining why she chose to speak to the defendant with Mr. McEwin and Mr. Weaver present, she remarked that the defendant had "in days past, tried to harm [her]" and had, on one occasion, "nearly caused [her] to wreck." Upon objection, the trial court advised the victim to answer only the question asked and to refrain from unsolicited comments. At another point, the victim, while an objection was pending, remarked that the defendant "ha[d] a violent nature and I do not wish to be around the man. Not only is he violent, he's nasty. His mouth is nasty." Again, the trial court advised the victim to answer only the questions asked and warned that if the victim continued with her

-6-

unsolicited remarks, "I may have to declare a mistrial."

Following the victim's apology and the prosecutor's warning the victim to relate only the facts of the offense and not to offer personal opinions, the victim testified at some length without any further outbursts. Later during her testimony, however, the victim stated that the defendant "had done that to someone else" in reference to the attack on her vehicle. At this point, the defendant objected and moved for a mistrial. The trial court instructed the jury to disregard the victim's statement and polled the jury to ensure that the verdict would not be affected by the extraneous information. The trial court also allowed the prosecutor to treat the victim as a hostile witness, thereby allowing the prosecutor to ask leading questions, in an effort to control the victim's testimony and prevent any further unsolicited comments.

In consideration of the motion for mistrial, the trial court noted that "it [was] obvious to the jury that these two people [were] feuding. They ha[d] a great deal of animus toward each other." The trial court also found the victim's statements "probably hurt her testimony more than it did [the defendant's] case." The statements made by the victim were gratuitous. Both the trial court and the prosecutor went to great lengths to control the extraneous comments. The strength of the State's case was relatively great, yet still could have been undermined by the victim's obvious contempt for the defendant when considered in the context of the defendant's self-defense claim. Furthermore, the trial court's curative instruction and polling of the jury also mitigated any possible prejudice from the statements. We agree with the State that the trial court did not abuse its discretion by denying the defendant's request for a mistrial.

*Sentencing Hearing Issues*

The victim testified at the sentencing hearing that the defendant was "very, very violent, irrational and irresponsible" and asked the trial court to sentence the defendant to "the hardest punishment possible." The defendant stated that he only tried to protect himself and admitted that he and the victim "both acted foolishly." The parties stipulated the accuracy of the presentence investigation report, showing that the defendant had no prior convictions, and the amount of restitution as $243.68.

The trial court found no enhancement factors to increase the defendant's sentence. Accordingly, the court imposed minimum sentences of three and two years for the aggravated assault and vandalism convictions. The court also found the defendant's

"preposterous story of self defense . . . insulting to the jury's intelligence and to mine." The court characterized the defendant's actions as "simple retaliation." The trial court denied judicial diversion, reasoning that the defendant was still not "impressed with the wrongfulness of his action." The court also denied full probation, but it did grant a sentence of split confinement, remarking that some incarceration was necessary to impress the defendant with the wrongfulness of his actions and that a period of probation would be "more effective to protect the victim" than a full term of incarceration.

## A. Judicial Diversion

The defendant argues that the trial court erred by denying his request for judicial diversion. The State contends that the court considered all principles applicable to diversion and properly denied diversion based upon the defendant's lack of remorse.

The term "judicial diversion" refers to the provision in Tennessee Code Annotated section 40-35-313(a) for a trial court's deferring proceedings in a criminal case. *See* T.C.A. § 40-35-313(a)(1)(A) (2006). Pursuant to such a deferral, the trial court places the defendant on probation "without entering a judgment of guilty." *Id.* To be eligible or "qualified" for judicial diversion, the defendant must plead guilty to, or be found guilty of, an offense that is not "a sexual offense or a Class A or Class B felony," and the defendant must not have previously been convicted of a felony or a Class A misdemeanor. *Id.* § 40-35-313(a)(1)(B)(i)(b), (c). Having been convicted of Class C and D felonies and with no prior criminal history, the defendant was eligible for judicial diversion.

Eligibility, however, does not automatically translate into entitlement to judicial diversion. *See State v. Bonestel*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000). The statute states that a trial court may grant judicial diversion in appropriate cases. *See* T.C.A. § 40-35-313(a)(1)(A) (court "may defer further proceedings"). Thus, whether an accused should be granted judicial diversion is a question entrusted to the sound discretion of the trial court. *Bonestel*, 871 S.W.2d at 168.

"Tennessee courts have recognized the similarities between judicial diversion and pretrial diversion and, thus, have drawn heavily from the case law governing pretrial diversion to analyze cases involving judicial diversion." *State v. Cutshaw*, 967 S.W.2d 332, 343 (Tenn. Crim. App. 1997). Accordingly, the relevant factors related to pretrial diversion also apply in the judicial diversion context. They are:

[T]he defendant's criminal record, social history, mental and physical condition, attitude, behavior since arrest, emotional stability, current drug usage, past employment, home environment, marital stability, family responsibility, general reputation and amenability to correction, as well as the circumstances of the offense, the deterrent effect of punishment upon other criminal activity, and the likelihood that [judicial] diversion will serve the ends of justice and best interests of both the public and the defendant.

*Id.* at 343-44; *see also State v. Washington*, 866 S.W.2d 950, 951 (Tenn. 1993). Moreover, the record must reflect that the trial court has weighed all of the factors in reaching its determination. *Bonestel*, 871 S.W.2d at 168. The trial court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others. *Id.*

On appeal, this court must determine whether the trial court abused its discretion in failing to grant judicial diversion. *Cutshaw*, 967 S.W.2d at 344; *Bonestel*, 871 S.W.2d at 168. Accordingly, when a defendant challenges the denial of judicial diversion, we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision. *Cutshaw*, 967 S.W.2d at 344; *Bonestel*, 871 S.W.2d at 168.

The record in this case reveals that the trial court gave proper consideration to all relevant factors in assessing the defendant's suitability for judicial diversion. The trial court placed significance on the defendant's continued insistence that he was justified in his actions as indicative of the defendant's lack of remorse. The trial court remarked that the defendant had "a dangerous state of mind" and ordered the defendant to complete an anger management course as a condition of probation. The trial court also noted the deterrent effect a period of confinement would have on the defendant's behavior. We conclude that the trial court did not abuse its discretion by denying judicial diversion in this case.

*B. Probation*

The defendant also argues, without citing to any authority, that the trial court erroneously denied him full probation. Once more, we could deem the issue waived under this court's rules. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by the argument, citation to authorities, or appropriate references to the record will be treated

as waived."). Nevertheless, we will address the defendant's challenge to the trial court's denial of full probation.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d)(2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing decision, the trial court was required to consider:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
> (2) The presentence report;
> (3) The principles of sentencing and arguments as to sentencing alternatives;
> (4) The nature and characteristics of the criminal conduct involved;
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40–35–113 and 40–35–114;
> (6) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40–35–210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

Because, in this instance, the sentence imposed is ten years or less, the trial

court was required to consider probation as a sentencing option. *See* T.C.A. § 40-35-303(a), (b). Nevertheless, the defendant bears the burden of establishing his "suitability for full probation." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-303(b); *State v. Bingham*, 910 S.W.2d 448, 455-56 (Tenn. Crim. App. 1995), *overruled in part on other grounds by Hooper*, 29 S.W.3d at 9-10. In consequence, the defendant must show that probation will "subserve the ends of justice and the best interest[s] of both the public and the defendant." *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (quoting *Hooper v. State*, 297 S.W.2d 78, 81 (1956)), *overruled on other grounds by Hooper*, 29 S.W.3d at 9-10.

Among the factors applicable to probation consideration, and common to the consideration of judicial diversion, are the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect upon the defendant; and the best interests of the defendant and the public. *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978). With reference to the previously discussed findings of the trial court concerning the defendant's overall sentencing, we conclude that the record supports the trial court's denial of full probation in this case.

*Conclusion*

The evidence is sufficient to support the defendant's convictions of aggravated assault and vandalism. The trial court did not abuse its discretion by denying the defendant's motion for a mistrial. Furthermore, the sentencing determinations of the trial court are supported by the record in this case. The judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE